Lawrence Eugene DELL, Petitioner,

v.

Dennis STRAUB, Respondent.

No. 00–CV–71853–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 28, 2002.

Lawrence Dell, Southern Michigan Correctional Facility, Jackson, MI, pro se.

Janet Van Cleve, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for respondent.

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

FRIEDMAN, District Judge.

Lawrence Eugene Dell, ("petitioner"), presently confined at the Southern Michigan Correctional Facility in Jackson, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, petitioner challenges his conviction and sentence on one count of attempted murder, M.C.L.A. 750.91; M.S.A. 28.286; and one count of placing explosives with intent to destroy causing injury to a person, M.C.L.A. 750.207; M.S.A. 28.404. For the reasons stated below, petitioner's application for writ of habeas corpus is **DENIED.**

### I. Background

Petitioner was convicted by a jury in the St. Clair County Circuit Court of attempting to murder his estranged wife, Charlene Dell, by mailing a package containing a bomb to her workplace.

Glenn Burk, a postal carrier, delivered a large package to the ANR Pipeline Company in Capac, Michigan on February 7, 1995. Burk left this package with the other mail in front of Paul Roggow's office door. Roggow took the mail and placed it on Charlene Dell's desk. Roggow returned to his office to work on some paperwork, when he heard an explosion. Roggow noticed that a fireball came across the ceiling and down the halls. Debris, the ceiling, and the lighting fixtures came falling down as a result of the explosion. Roggow observed smoke and a strong odor that smelled like an "ether-type" starting fluid.

Roggow and fellow employee Dennis Castle came running out of their offices and observed the victim with her clothes and hair on fire. Roggow told the victim to drop to the floor and Castle put the fire out by smothering the flames with insulation which had fallen from the ceiling.

Roggow testified to an incident involving the victim and petitioner at the ANR office in Capac the previous summer. After this incident, the victim had appeared disturbed and did not want to be alone with petitioner if he ever appeared at the office again. After this incident, ANR sent security personnel from the Detroit office to review security procedures at the Capac office. They also issued a memorandum that petitioner was not to enter the Capac office.

Robert Derocha was the superintendent of the ANR Capac facility. In the summer of 1994, Derocha heard a "heated conversation" between the victim and petitioner at the office. Derocha left the office to give the victim some privacy. When he returned to the office, the victim appeared "very distraught, very anxious, fearful." Derocha testified that the victim began locking herself in her office. A corporate security manager from the Detroit office came to the facility and after reviewing the situation, made a number of security recommendations. All of the employees were instructed that they were to call the sheriff's department if petitioner appeared on the company premises. On the occasions

when the victim was the only person in the building, it was to be secured to prevent access to the office areas.

Derocha testified that the bomb caused the steel liner walls to be shoved and pushed out and also blew out the ceiling. Conduit was blown off the walls in an adjacent garage area. The steel wall purlins and the structural steel purlins in the side were bent and sticking outward. The aluminum skin that covered both the sidewall and roof were buckled outward. A hole had been blown into the building above the victim's desk. Derocha testified that there was substantial structural damage around the perimeter of the entire building.

Dennis Castle had known the victim for 13 or 14 years and was aware that she was going through a divorce in the spring of 1994. Prior to the divorce, Castle testified that he and the victim were good friends. However, the relationship became intimate when Castle learned that the victim filed for divorce.

Castle testified that he did not open the package containing the bomb because in addition to the mailing label, the package had "Attention Charlene Dell" written on it with a felt tip marker. Castle recalled seeing a return address label on the package that appeared to be from the ANR Detroit office in the Renaissance Center. When the explosion occurred, Castle exited his office and observed the victim coming out of her office. Castle described the victim as "a ball of fire." Castle and Roggow put the fire out. The victim told Castle, "He got me, Dennis, he finally got me." The victim also said that the bomb looked like dynamite.

Michael Rumley, ANR's corporate security manager, testified that the standard ANR mailing label had a distinctive "C" logo above the company name. The "C" was lined up on the left edge of the company name on the mailing labels. The only

place where this "C" logo was centered over the company name was on the company newsletter, *Transmission Lines*, which was mailed to the home of all ANR employees every two months. When Brumley was shown the return mailing label from the package that had exploded, he testified that this looked like the *Transmission Lines* logo. Brumley testified that the return labels on two other packages, which had contained explosives and had been mailed to ANR facilities in Reed City and Big Rapids, had the same logo on them.

After the explosion at the Capac office, Brumley alerted the other ANR offices to be on alert for similar packages. On February 9, 1995, the Reed City and Big Rapids offices each received a similar package. Later that day, Brumley was informed that the New Haven Post Office was holding a similar package which had been mailed to an unmanned ANR pumping station in New Haven.

Michigan State Police examined these packages using X-ray photographs. The bombs contained in the packages sent to Big Rapids and Reed City were substantially similar. The two packages were also similar to one another and similar to the remnants of the package which had exploded in Capac.

Michael O'Hara, a United States Postal Inspector, indicated that the device that injured the victim consisted of a pipe bomb, with six cans of starter fluid, a nine volt battery, and wire switches that were unique. Investigators also found a partial mailing label and a return address label in the victim's office. O'Hara examined the three disabled bombs and the remains of the Capac bomb. The three disabled bombs shared the same pipe size, the same kind of end caps, the same silicone sealer on one end, and they all had white paint on one end. O'Hara indicated that the New

Haven device contained switches of the same type found at the blast site in Capac. The Capac bomb differed from the other bombs in that it had deep scoring in the pipe, the purpose of which would be to weaken the pipe to increase the chance of fragmentation for anti-personnel effect. The switches on the Capac device were set so that the bomb would go off whether the top or the bottom of the package was opened. O'Hara indicated that the three other bombs had been mailed from the Renaissance Center Post Office.

Agent Randy Evans of the Bureau of Alcohol, Tobacco, and Firearms also testified about the similarities between the four bombs. The only differences between the bombs were that the Capac bomb had been designed to aid in fragmentation, and that somewhat different types of tape had been used in building the four bombs, one type of tape on two bombs, and one type of tape on the other two.

Employees from the Renaissance Center Post Office recalled a man mailing four packages from their office, two on February 6, 1995, and two on February 7, 1995. One of the clerks from the post office described the man as being a Caucasian, about five feet, nine or ten inches tall, with medium to dark brown hair, wearing sunglasses.

Drew Somerford, a forensic document analyst for the U.S. Postal Service, examined the mailing labels found on the three unexploded packages, as well as the remains of the labels from the Capac package. Somerford concluded that the labels had been produced by either a copy machine or a computer printer, and that they had been enlarged. Each label had been individually cut, either by hand or by using a paper cutter. The labels appear to have been made at the same time by using the ANR employee magazine *Transmission Lines* as a model. Somerford believed that all four labels originated from the same source.

Scott Peters, a forensic latent print examiner for the U.S. Postal Inspection Service, testified that he found two latent fingerprints inside the package of the New Haven bomb, on the adhesive side of two pieces of tape. Peters also found one latent fingerprint on the package of the Reed City bomb on the non-adhesive side of the tape. These latent prints were matched with petitioner's exemplar prints. Peters determined that these three fingerprints matched petitioner's fingerprints.

The victim's co-workers testified about petitioner's behavior while the divorce proceedings were pending. Norbert Brinker testified that petitioner took photographs of him and the victim while they were at a sidewalk lunch stand and while they were en route back to the ANR office. Joel Walker was talking with the victim at a Little League parade when petitioner pulled up on a motorcycle and began screaming at them. About a month before the bombing, petitioner told Walker over the telephone that "If I can't have her, nobody else will."

Wayne Dittman was a mechanical contractor who was friendly to petitioner. Dittman indicated that petitioner had a key to his shop and could come and go as he liked. Dittman had tools to cut pipe like the ones used in the ANR bombs. Dittman also indicated that pipe like the kinds used in the bombs was readily accessible. Dittman testified that petitioner was familiar with dynamite and he had seen him use it to blow up tree stumps. At least one time, petitioner had placed a can of ether next to a stick of dynamite to see what would happen. Petitioner and Dittman discussed his divorce proceedings. At one point, petitioner told Dittman that it would be cheaper to get rid of the victim than to divorce her.

Jim Dougherty, one of petitioner's neighbors, testified that petitioner set off a lot of dynamite on his property for no reason. The neighbors referred to petitioner, in fact, as "Dynamite Dan". On one July 4th, Dougherty observed an explosion that petitioner informed him had been enhanced by taping a can of ether to a stick of dynamite.

Mark Malcolm had been incarcerated with petitioner at the Federal Correctional Facility in Milan, Michigan while petitioner was awaiting trial. On one occasion, Malcolm was reviewing some of the evidence against petitioner with him and advised him that he should plea bargain with the prosecutor. When Malcolm said this, petitioner broke down and said that "he never meant to hurt her".

United States Postal Inspector Richard Ramirez was one of the arresting officers. During a routine processing of petitioner, petitioner made the unsolicited statement: "I didn't mean to hurt her."

The victim, Charlene Dell, testified that she had been married to petitioner for twelve years and had two children with him. The victim filed for divorce in March of 1994. When petitioner was served with the divorce papers, he returned home in a rage. During the ensuing months, petitioner harassed the victim at the house, her cousin's house, her place of employment, and in the Village of Capac. The divorce trial was scheduled for March of 1995.

On February 7, 1995, the victim went to open the package that had been sent to the ANR office. When she opened the package, she saw red and white wires and thought that there was dynamite in the box. Before the victim could escape, she lost balance and an enormous ball of fire engulfed her in flames.

Petitioner's conviction was affirmed on appeal. *People v. Dell*, 1998 WL 1991599 (Mich.Ct.App.1998); *Iv. den.* 459 Mich.

978, 593 N.W.2d 551 (1999). Additional facts will be discussed when addressing the individual claims. Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:

I. Petitioner was deprived of his Fifth, Sixth, and Fourteenth Amendment rights when the trial court's denial of defense counsel's right to cross-examine prosecution witnesses and introduce evidence violated defendant's right to the effective assistance of counsel and due process of law.

II. Petitioner was deprived of his Sixth and Fourteenth Amendment rights where the admission of evidence of defendant's alleged prior acts and statements constituted reversible error, where any probative value was heavily outweighed by the danger of unfair prejudice.

III. Petitioner was deprived of his Fifth and Fourteenth Amendment rights where the court reversibly erred in denying defendant's motion to suppress admissions at the conclusion of a *Walker* hearing and allowing statements allegedly made by defendant in violation of *Miranda v. Arizona.*

IV. Petitioner's due process rights were violated where there was insufficient evidence to sustain a verdict, in violation of the Fourteenth Amendment.

V. Petitioner's due process rights were violated where the verdict was against the great weight of the evidence, in violation of the Fourteenth Amendment.

VI. Petitioner was denied the effective assistance of counsel.

VII. Petitioner was denied due process of law in violation of the Fifth and Fourteenth Amendment rights where the trial court erred in denying defendant's motion to dismiss Count II, detonation of a bomb to damage a building, despite the fact that prosecution witnesses testi-

fied that the intent of the device was solely to injure a person.

VIII. Petitioner was denied due process of law, in violation of the Fifth and Fourteenth Amendments, where the trial court erred in denying petitioner's motion to dismiss Count II, on grounds that the information failed to charge defendant with placing an explosive device with the intention of damaging a building, as required under M.C.L. 750.207.

IX. Petitioner was denied his Sixth Amendment right to a fair, impartial, and indifferent jury and his Fourteenth Amendment due process right to a fair trial, where the trial court's failure to order individual, sequestered voir dire and to change venue *sua sponte* (was) prejudicial error, in light of the overwhelming and pervasive pretrial publicity and the personal relationship between the prosecutor, the trial judge, and the panel.

X. Petitioner was denied his due process right to a fair trial under the Fifth and Fourteenth Amendments where the trial court prejudicially erred by admitting certain photographs, because the prejudicial effect (outweighed) any probative value.

XI. Prosecutorial misconduct denied petitioner his due process right to a fair trial, in violation of the Fifth and Fourteenth Amendments.

XII. Petitioner is entitled to a new trial on ground of newly discovered evidence.

XIII. Prosecutorial or law enforcement misconduct in suppressing exculpatory evidence in violation of the court's discovery order and petitioner's due process right to a fair trial, in violation of the Fifth and Fourteenth Amendments.

### II. Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997).

■■■ A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor,* 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495.

### III. Discussion

**A. Claim # 1. The Confrontation Clause claim.**

Petitioner first contends that the trial court violated his Sixth Amendment right to confrontation by limiting cross-examination of some of the prosecution witnesses on certain matters.

 The Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, that the defendant might wish. *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (internal citations omitted). The Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing limits on a defense counsel's inquiry into potential bias of a prosecution witness; to the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, a witness' safety, or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Where it is merely the extent of cross-examination into a certain area that is limited, the trial judge retains much wider latitude of discretion, although that discretion may still be abused. *Dorsey v. Parke,* 872 F.2d 163, 166 (6th Cir.1989). Moreover, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff,* 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)(*quoting Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)).

 In the present case, the limitations placed on cross-examination of witnesses involved situations in which defense counsel was either attempting to elicit hearsay or irrelevant evidence, or had failed to lay a foundation for the admission of the testimony. The Confrontation Clause is not violated by limiting the questioning of witnesses on the grounds that the evidence is hearsay or irrelevant. *See Takacs v. Engle,* 768 F.2d 122, 125 (6th Cir.1985). Requiring a defendant to lay a foundation for the admissibility of certain evidence also does not violate the Confrontation Clause. *See Reddick v. Haws,* 120 F.3d 714, 717 (7th Cir.1997). Therefore, petitioner's confrontation clause rights were not violated by the trial court limitations on cross-examination in this case.

## B. Claims # 2 and # 10. The state evidentiary ruling claims.

Petitioner's second and tenth claims have been consolidated for purposes of judicial economy. In his second claim, petitioner alleges that the trial court erred in permitting "bad acts" or "other acts" testimony concerning marital discord between himself and the victim, as well as evidence that petitioner had knowledge and experience using explosives and had sent explosives to other ANR facilities. In his tenth claim, petitioner alleges that the trial court erred in admitting into evidence photographs of the victim's injuries, which he claims were more prejudicial than probative.

 Habeas review does not encompass state court rulings on the admission of evidence unless there is a federal constitutional violation. *Clemmons v. Sowders,* 34 F.3d 352, 357 (6th Cir.1994). Only where the erroneous application of state law deprives a petitioner of a fundamental constitutional guarantee will a federal court inquire into the state court rulings. *Donnelly v. De Christoforo,* 416 U.S. 637, 642–643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

 With respect to petitioner's second claim, a federal habeas court will not disturb a state court's admission of evidence of prior crimes, wrongs, or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that admitting the evidence denies the peti-

tioner the due process of law. *Hopkinson v. Shillinger*, 866 F.2d 1185, 1197 (10th Cir.1989); *Cosme v. Elo*, 2000 WL 246592, * 3 (E.D.Mich. February 4, 2000) (Cohn, J). The inquiry in reviewing a claim of improper admission of prior bad acts evidence is whether the evidence was rationally connected to the crime charged. *Carter v. Jago*, 637 F.2d 449, 457 (6th Cir. 1980).

■ In the present case, the testimony concerning the marital discord between the petitioner and the victim and petitioner's prior threats about or towards the victim was relevant to establish petitioner's intent and motive to commit these crimes. *See Butcher v. Marquez*, 758 F.2d 373, 378 (9th Cir.1985) (evidence of petitioner's uncharged attempt to kill wife admissible in trial for assault with intent to murder wife, to establish evidence of petitioner's intent to kill). Moreover, evidence of petitioner's involvement with explosives and his connection to the other packages that were sent to the other ANR offices was relevant to show a scheme, plan, motive, knowledge, intent, absence of mistake, or identity. *See United States v. Franks*, 511 F.2d 25, 36 (6th Cir.1975). The evidence was rationally connected to the crime charged here and did not deprive petitioner of due process.

■ Petitioner's tenth claim must also fail. The Michigan Court of Appeals determined that the three photographs of the victim's injuries were more probative than prejudicial, because intent to murder was a key element of the attempted murder charge and the photographs were offered to prove petitioner's intent.

■ Appraisals of the probative and prejudicial value of evidence are entrusted to the sound discretion of a state trial court judge, and a federal court considering a habeas petition must not disturb that appraisal absent an error of constitutional dimensions. *See United States ex.*

*rel. Gonzalez v. DeTella*, 918 F.Supp. 1214, 1220 (N.D.Ill.1996). Whether the admission of prejudicial evidence in a criminal trial constitutes a denial of fundamental fairness, so as to warrant federal habeas relief, turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor. *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir.2000); *cert. den.* 532 U.S. 1012, 121 S.Ct. 1744, 149 L.Ed.2d 667 (2001).

In the present case, the issue of whether petitioner intended to kill the victim was a highly significant factor in this case, particularly where petitioner told two different persons that he didn't mean to hurt the victim. Even if the photographs of the victim's injuries were inflammatory, any inflammatory tendency of these photographs fails to exceed the evidentiary value in showing petitioner's intent and therefore fails to establish a due process claim. *See Jamison v. Collins*, 100 F.Supp.2d 647, 704 (S.D.Ohio 2000).

## C. Claim # 3. Petitioner's *Miranda* claim.

Petitioner next claims that the trial court erred in refusing to suppress a statement that he made to Postal Inspector Ramirez, in which he told Ramirez that he didn't mean to hurt his wife. Petitioner claims that this statement was made prior to him being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

During trial, an evidentiary hearing was conducted outside of the jury's presence concerning the admissibility of this statement. Inspector Ramirez indicated that he and Agent Evans had taken petitioner into an office after his arrest to explain the procedure that would be followed after petitioner was processed, including the fact that petitioner would be taken over to jail where he would be detained until the next

day, at which time arrangements would be made for petitioner to obtain counsel and to have a preliminary hearing. After fifteen or twenty minutes, Agent Evans left the room. Petitioner looked up at Ramirez and said "I love my wife. I never meant to hurt her" and began crying. Moments later, Agent Evans returned. At that time, Ramirez advised petitioner of his *Miranda* warnings. At this point, petitioner invoked his right to counsel. Ramirez claimed that petitioner's statements were not made in response to any questions made by him.

Petitioner testified that he was arrested at the Ford Plant in Romeo and was taken to downtown Detroit. Petitioner claimed that agents began asking him questions about whether he had committed the crime, his relationship with the victim, and the divorce. Petitioner claims that none of the agents ever read him his *Miranda* warnings.

Agent Evans also testified about the arrest of petitioner. Evans denied asking petitioner questions about the crime and insisted that he merely explained to petitioner the procedure for arraigning a defendant in the federal system.[1]

After hearing the testimony, the trial court found the testimony of Ramirez and Evans that they had not interrogated petitioner and had only explained court procedures to him to be credible. The trial court was satisfied that petitioner's statement was nonresponsive to any question being asked of him by the agents. (T. pp. 732–733).

A federal court must apply the presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. *Bailey*

*v. Mitchell,* 271 F.3d 652, 656 (6th Cir. 2001); 28 U.S.C. § 2254(e)(1). State court factual findings as to what the circumstances were at the time of a suspect's interrogation, to determine whether *Miranda* warnings were required, are entitled to the presumption of correctness on habeas review. *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). A state court's finding that no express interrogation of a habeas petitioner occurred is also a factual finding which is entitled to the presumption of correctness. *Endress v. Dugger,* 880 F.2d 1244, 1249 (11th Cir.1989).

In the present case, the state trial court made a factual determination that petitioner's statement was not made in response to any questions made by Inspector Ramirez or Agent Evans, but was an unsolicited statement. Petitioner has not offered any clear and convincing evidence to rebut this factual finding that no express interrogation had taken place when petitioner volunteered this statement. This Court is therefore bound by the state trial court's findings that no express interrogation of petitioner had taken place when he made this statement.

The special procedural safeguards outlined in *Miranda* are required not merely when a suspect is taken into custody, but instead where a suspect in custody is subjected to interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). " 'Interrogation', as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id. Miranda* warnings are required whenever a person in custody is subject either to express

---

1. Petitioner was initially charged federally with this crime. Those charges were later dismissed after his conviction in state court.

questioning or its "functional equivalent". *Rhode Island v. Innis,* 446 U.S. at 300–301, 100 S.Ct. 1682. Thus, for *Miranda* purposes, the term "interrogation" refers not only to express questioning of a suspect by law enforcement officials, but also to "any words or actions on the part of the police *(other than those normally attendant to [an] arrest or custody* ) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682 (emphasis added).

In the present case, petitioner's statement was not a response to any interrogation by Inspector Ramirez. Thus, its admission presents no constitutional problem. *See United States v. Prior,* 941 F.2d 427, 430 (6th Cir.1991). Petitioner's third claim does not entitle him to relief.

### D. Claims # 4, # 5, and # 7. The sufficiency of evidence claims.

Petitioner's fourth, fifth, and seventh claims have been consolidated because they are all interrelated. In his fourth claim, petitioner contends that there was insufficient evidence presented to establish his identity as the perpetrator. In his fifth claim, petitioner contends that the verdict went against the great weight of the evidence. In his seventh claim, petitioner contends that there was insufficient evidence to convict him of placing explosives with intent to destroy causing injury to a person, because there was no evidence presented that he intended to destroy a building.

■■■■■ A habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Scott v. Mitchell,* 209 F.3d 854, 885 (6th Cir.2000) (citing to *Jackson v. Virgi-*

*nia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable. *Matthews v. Abramajtys,* 92 F.Supp.2d 615, 632 (E.D.Mich.2000) (Tarnow, J.). A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). In reviewing a sufficiency of evidence question, a court "resolves all conflicts in the testimony in favor of the government and draws every reasonable inference in its favor." *United States v. Doe,* 226 F.3d 672, 680 (6th Cir.2000).

■■■■ In the present case, petitioner first claims that the evidence was legally insufficient because of various inconsistencies between the testimony of the witnesses which would call into question their credibility. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker,* 231 F.3d 265, 286 (6th Cir.2000). The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Id.*

■■■■■ Petitioner next contends that his convictions should be set aside because the evidence in this case was entirely circumstantial and was based upon inferences. A conviction may rest on circumstantial evidence and a federal habeas court reviewing the sufficiency of evidence to support a conviction need not rule out all possible interpretations of the circumstantial evidence. *Jamison v. Collins,* 100 F.Supp.2d at 705. A conviction may be based upon circumstantial evidence as well as inferences based upon the evidence. *Gonzalez v. Reiner,* 177 F.Supp.2d 211, 218

(S.D.N.Y.2001) (*quoting United States v. Strauss,* 999 F.2d 692, 696 (2nd Cir.1993)). The law does not require that the identity of a defendant be established by an eye-witness. Identity of a defendant can be inferred through circumstantial evidence. *United States v. Kwong,* 14 F.3d 189, 193 (2nd Cir.1994).

█ In the present case, there was sufficient evidence presented at trial for a rational trier of fact to conclude beyond a reasonable doubt that petitioner was the perpetrator of the crime. Ample evidence was presented of the marital difficulties that petitioner and the victim had been having. About a month prior to the bombing, petitioner told Joel Walker that "If I can't have her, nobody else will". Petitioner told his friend Wayne Dittman that it would be cheaper to kill the victim than to divorce her. Numerous witnesses testified to petitioner's prior experience with, and use of, dynamite and other explosives, including ether, which Paul Roggow claimed to have smelled at the time of the blast. Petitioner's fingerprints were found inside of two other packages that had been sent to other ANR offices containing explosives similar to the one which went off at the Capac office. Most significantly, although four bombs were sent to four different ANR offices, the Capac bomb differed from the other bombs in that it had deep scoring in the pipe, the purpose of which would be to weaken the pipe to increase the chance of fragmentation for anti-personnel effect. When viewed in a light most favorable to the prosecution, the circumstantial evidence in this case established the identity of petitioner as the perpetrator in this case. Petitioner's fourth claim is without merit.

█ Petitioner's related seventh claim can be disposed of even easier. Petitioner claims that there was insufficient evidence to show that he intended to injure a building when he sent the bomb. However,

Robert Derocha and other ANR employees testified to the extensive damage that the ANR building suffered as a result of the explosion. A rational trier of fact could therefore conclude that petitioner sent the bomb with the intent of injuring the building as well as his wife.

█ Finally, in his fifth claim, petitioner argues that his verdict went against the great weight of the evidence. A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence. *Young v. Kemp,* 760 F.2d 1097, 1105 (11th Cir.1985); *See also Thomas v. McLemore,* 2001 WL 561216, * 5 (E.D.Mich. March 30, 2001) (Borman, J.). A claim that a verdict went against the great weight of the evidence is not of constitutional dimension, for habeas corpus purposes, unless the record is so devoid of evidentiary support that a due process issue is raised. *Griggs v. State of Kansas,* 814 F.Supp. 60, 62 (D.Kan.1993). The test for habeas relief is not whether the verdict was against the great weight of the evidence, but whether there was any evidence to support it. *United States ex. rel. Victor v. Yeager,* 330 F.Supp. 802, 806 (D.N.J. 1971). Because there was sufficient evidence to convict petitioner of these crimes, the fact that the verdict may have gone against the great weight of the evidence would not entitle him to habeas relief.

### E. Claim # 6. The ineffective assistance of counsel claims.

Petitioner next brings a multitude of ineffective assistance of counsel claims.

#### 1. *Standard of Review*

█ To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, con-

sidering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.; O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir.1994). In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### 2. *The individual claims.*

#### A. *Failure to challenge the decision to bind petitioner over for trial.*

Petitioner first argues that his attorney failed to object to the improper bindover of petitioner at the preliminary examination on Count II of the complaint.

 At the preliminary examination, evidence was presented that a bomb was sent to the ANR Company and that the victim was severely injured. There was also sufficient evidence presented that the building had been damaged. Petitioner is therefore unable to show that the case would not have been bound over for trial had his attorney objected. Because petitioner has not established that he was prejudiced by counsel's failure to object to

his bind over, his ineffective assistance of counsel claim fails. *State v. Street,* 202 Wis.2d 533, 547, 551 N.W.2d 830 (Wis.App. 1996).[2]

#### B. *Failure to request individual, sequestered voir dire, failure to exhaust peremptory challenges, and failure to move for a change of venue.*

Petitioner next claims that because of pervasive pre-trial publicity in this case, counsel was ineffective for failing to request individual, sequestered voir dire of the jurors, failed to exhaust all twelve of his peremptory challenges, and failed to move for a change of venue.

 To establish ineffective assistance of counsel for failing to move for a change of venue due to prejudicial pretrial publicity, a defendant must show, at a minimum, that the trial court would have, or should have, granted a change of venue motion, and this requires a showing of actual or presumed prejudice on the part of the jury. *Tafoya v. Tansy,* 9 Fed.Appx. 862, 871 (10th Cir.2001) (internal citations omitted). For the reasons stated in greater detail in addressing petitioner's ninth claim, *infra,* petitioner has failed to show any actual or presumed prejudice on the jury's part in this case because of pre-trial publicity. Therefore, he is unable to establish that counsel was ineffective for failing to request a change of venue. Petitioner has also failed to establish that counsel was ineffective for failing to request individual voir dire. A defense counsel's failure to request individual voir dire of the jury is not ineffective assistance of counsel, absent any indication in the record that group questioning of the jurors was insufficient or that the composition of

---

**2.** When there is paucity of federal law on a subject, state decisions interpreting the Federal Constitution, while not binding on federal court, are persuasive. *See Alvarez v. Straub,* 64 F.Supp.2d 686, 698 fn. 5 (E.D.Mich.1999) (Rosen, J.).

the jury would have been different had the jurors been questioned individually. *See Kilgore v. Bowersox,* 124 F.3d 985, 994 (8th Cir.1997). Petitioner has offered no argument as to how the composition of the jury would have been different had his attorney requested individual voir dire. Lastly, while petitioner alleges that his counsel failed to exercise all of his peremptory challenges as a prerequisite to arguing a motion for change of venue, petitioner has failed to identify any juror or jurors that should have been removed by counsel, nor does he allege that any of the jurors who were seated were unfavorably disposed towards him. *See Mattheson v. King,* 751 F.2d 1432, 1438 (5th Cir.1985).

C. *Failure to determine the exact times that the packages were mailed.*

■■■ Petitioner next claims that his attorney was ineffective for failing to determine the time that the packages were mailed from Detroit, claiming that methods exist to make this determination, such as an electronic record of the meter strip or log. Petitioner, however, does not offer any evidence to prove that such methods exist. Mere conclusory allegations in support of claims of ineffective assistance of counsel are insufficient, as a matter of law, to raise a constitutional issue. *Cordova v. Johnson,* 993 F.Supp. 473, 524 (W.D.Tex. 1998).

D. *Failure to investigate or introduce evidence about other possible suspects.*

■■■ Petitioner claims that counsel was ineffective for failing to introduce evidence that other persons had grievances against either ANR or against the victim in order to show that another person may have sent the bomb to the victim's office.

Other than possible motive, petitioner offers no evidence that would support a finding that any of these persons sent a bomb to the ANR company. Moreover, petitioner was not denied the effective assistance of counsel as a result of counsel's failure to investigate and argue the culpability of other suspects, in light of the substantial evidence of petitioner's guilt in this case. *See Jackson v. Anderson,* 141 F.Supp.2d 811, 859 (N.D.Ohio 2001).

E. *Failure to call alibi witnesses.*

■■■ In this case, counsel presented several alibi witnesses to account for petitioner's whereabouts at various times on February 6 and 7, 1995, when the four packages containing the explosives were mailed. However, petitioner also claims that he advised counsel that he had been at work on February 7, 1995 and offered to provide the names of alibi witnesses to counsel. Defense counsel's failure to investigate, interview, or present alibi witnesses does not amount to the ineffective assistance of counsel, because petitioner has failed to identify these witnesses, indicate their availability, or specify the content of their testimony. *United States v. Green,* 21 F.Supp.2d 521, 525 (D.Md.1998). Petitioner's vague and speculative allegations that defense counsel was ineffective for failing to investigate alibi witnesses does not entitle him to habeas relief. *See United States ex. rel. DeCreti v. Wilson,* 967 F.Supp. 303, 307–308 (N.D.Ill.1997).

F. *Failure to call expert witnesses.*

■■■ Petitioner next claims that counsel was ineffective for failing to call expert witnesses to testify on his behalf. Petitioner first contends that his counsel was ineffective for failing to have explosive experts investigate the four packages to determine if in fact each one could have been detonated and to find other evidence which could exculpate petitioner. Petitioner has failed to demonstrate that he was denied the effective assistance of counsel from his

trial counsel's failure to use or call an expert witness on explosives, because he has failed to present any testimony to establish that an expert witness could have been obtained to testify favorably for him. *See Albanese v. McGinnis*, 823 F.Supp. 521, 537 (N.D.Ill.1993).

Petitioner also claims that his counsel was ineffective for failing to call a fingerprint expert to pursue the theory that his fingerprints had been forged. The weakness with petitioner's claim is that there is no convincing evidence that law enforcement officials in this case planted his fingerprints, nor does petitioner contend that an expert witness would have testified that the fingerprints found on the packages did not match petitioner's fingerprints. Petitioner has therefore failed to establish the requisite prejudice to establish an ineffective assistance of counsel claim. *Tafoya v. Tansy*, 9 Fed.Appx. at 869. Counsel's decision not to put on an expert to discuss the possibility of fingerprint forgery, if indeed such testimony was available, was a tactical decision and did not constitute ineffective assistance of counsel. *United States v. Kirsh*, 54 F.3d 1062, 1072 (2nd Cir.1995).

### G. *Failure to adequately cross-examine and impeach witnesses.*

Petitioner next claims that his counsel's cross-examination was deficient. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir.1997). Where trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim. *Cardwell v. Netherland*, 971 F.Supp. 997, 1019 (E.D.Va.1997). Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available. *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 607 (E.D.Mich.2001) (Tarnow, J.) (internal citations omitted).

Petitioner has failed to show that he was prejudiced by the alleged deficiencies in counsel's cross-examination of the witnesses. Petitioner first claims that counsel failed to question Theodore Collum, a bank vice president who saw petitioner twice on the morning of February 6, 1995 in Capac, Michigan, about the latest time that he saw petitioner on February 6, 1995. Collum first saw petitioner at 8:00 a.m. and later at 8:30 or 9:00 a.m. Bank records show that petitioner later made a deposit at the bank at 11:01 a.m. that morning. Petitioner suggests that Collum's testimony could have precluded him from mailing the packages in Detroit, Michigan on February 6, 1995. However, in light of the fact that the postal workers at the Renaissance Center Post Office could not testify about the exact time that the packages were mailed on February 6 or 7, 1995, petitioner is unable to show how he was prejudiced by counsel's failure to ask this question.

Petitioner claims that counsel should have impeached the victim with the fact that she had told investigators that she did not recall whether the label on the package containing the bomb said "Attention: Charlene Dell" or "Attention: Administrator". In light of the fact that Dennis Castle also testified that the package was addressed to the victim, petitioner has failed to show how he was prejudiced by counsel's failure to impeach the victim on this point.

Petitioner also claims that counsel failed to cross-examine the victim about the fact that petitioner never actually assaulted her

at her place of employment, failed to ask her about a letter that petitioner sent her which stressed the impropriety of adultery, not the submission of wives to their husbands, failed to question the victim that she had just taken out an accident/disability policy, failed to question her about a house that she was building with Dennis Castle at the time of the bombing, failed to discover or question the victim about marital assets that she was secreting, and failed to question her about a personal injury lawsuit that she was seeking to file against petitioner as a result of the bombing. Petitioner also claims that counsel should have questioned various witnesses about the fact that Castle and the victim were having an intimate relationship prior to the divorce being filed.

Petitioner has failed to show how he was prejudiced by counsel's failure to pursue these lines of questioning. Some of the points that petitioner wished to have raised would have been of marginal benefit in attacking the prosecutor's case. Some of the lines of questioning, such as eliciting testimony that Castle and the victim had an intimate relationship prior to the divorce, could actually have provided a stronger motive for petitioner to send this bomb to his wife. Counsel was therefore not deficient for failing to cross-examine the witnesses about these issues.

Petitioner next claims that counsel's cross-examination of the witnesses who observed petitioner handling other explosives was deficient because it failed to put the use of these explosives in the proper context for which they were used. However, a number of witnesses testified that petitioner had used explosives to blow up tree stumps. Therefore, witness testimony provided the context in which these explosives had been used by petitioner in the past.

Petitioner also claims that counsel failed to elicit testimony that lighter fluid that was sold in retail stores was kept in the back room and was not accessible to the public. Petitioner provides no evidence to support his claim that lighter fluid is not accessible to the public at retail stores, nor does he show how this would have prevented him from purchasing lighter fluid. This claim is rejected as being conclusory. *Cordova v. Johnson*, 993 F.Supp. at 524.

Petitioner also claims that counsel should have more extensively impeached the credibility of Mark Malcolm. However, by petitioner's own admission, counsel asked Malcolm questions to impeach his credibility. Moreover, in light of the fact that petitioner made the same admission to Inspector Ramirez that he made to Malcolm, petitioner is unable to show how he was prejudiced by counsel's failure to more effectively impeach Malcolm's credibility.

Petitioner also claims that defense counsel failed to elicit testimony about the fact that a search of petitioner's yard failed to reveal the presence of any explosives. Petitioner also contends that counsel should have elicited testimony about the fact that petitioner had not purchased explosives in the previous year. While cross-examination in these areas may have been helpful, the fact that no explosives were found in petitioner's yard or that there was no evidence that he had purchased explosives in the previous year would not necessarily have exculpated him of this crime.

H. *Failure to seek suppression of the fingerprint evidence because of a break in the chain of custody.*

Petitioner next claims that counsel was ineffective for failing to challenge the admission of the fingerprints due to a break in the chain of custody.

 The prosecution does not need to prove a perfect chain of custody for evidence to be admitted at trial. *United States v. Lott*, 854 F.2d 244, 250 (7th Cir.

1988). Gaps in the chain of custody normally go to the weight of the evidence, rather than its admissibility. *Id.* Law enforcement officials only need to show that they took "reasonable precautions" to preserve the original condition of the evidence, but they do not have to exclude all possibilities of tampering with the evidence. *Lott,* 854 F.2d at 250. Finally, a "presumption of regularity" exists with respect to the official acts of public officers, and absent evidence to the contrary, the court presumes that the official duties were discharged properly. *Id.*

In the present case, any gaps in the chain of custody of the fingerprints would have gone to the weight of the evidence, not its admissibility. Therefore, counsel was not ineffective for failing to seek suppression of the fingerprints on this basis.

As to petitioner's related claim that counsel was ineffective for failing to cross-examine the prosecution witnesses about the break in the chain of custody to establish a possible forgery of his fingerprints, as mentioned above, petitioner has failed to show that his fingerprints were forged. Therefore, petitioner was not prejudiced by counsel's failure to cross-examine the witnesses about the alleged break in the chain of custody.

I. *Failure to investigate the drive time between Imlay City and downtown Detroit.*

 Petitioner next claims that counsel was ineffective for failing to investigate the amount of time that it would take to drive from his home in Imlay City to downtown Detroit, in order to show that petitioner could not have driven from Imlay City to Detroit in seventy five minutes. Petitioner claims that it takes much longer to drive from Imlay City to Detroit, thus making it impossible for him to have been seen in Imlay City at the times that he was seen on February 6, 1995, and yet at the same time, drive to Detroit to mail the packages. Petitioner, however, offers no evidence, other than his own conclusory allegations, that it takes longer than seventy five minutes to drive from Imlay City to Detroit. Because his allegation is conclusory, it is insufficient to state an ineffective assistance of counsel claim. *Cordova v. Johnson,* 993 F.Supp. at 524.

J. *Counsel's advice regarding whether petitioner should testify.*

 Finally, petitioner claims that he was deprived of the effective assistance of counsel, because his attorney advised him not to testify.

In this case, petitioner has not indicated what his testimony would have been had he been permitted to take the stand. Because petitioner has never indicated what his testimony would be had he taken the stand, he is unable to show that he was prejudiced by counsel's failure to call him to testify. *Foster v. Delo,* 39 F.3d 873, 877 (8th Cir.1994).

3. *Conclusion*

Petitioner was not deprived of the effective assistance of counsel.

**F. Claim # 8. The defective information claim.**

Petitioner next claims that the criminal information filed in this case was defective, because the second count of the information charged petitioner with placing an explosive with an intent to injure his wife, rather than to injure a building. The trial court permitted the prosecution to amend the information at trial to allege that petitioner had placed the explosive with the intent to injure the building.

 A complaint or indictment need not be perfect under state law so long as it adequately informs the petitioner of

the crime in sufficient detail so as to enable him or her to prepare a defense. Therefore, an indictment "which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir.1986). A claim of a variance between a criminal information and the evidence at the state court trial is not reviewable by way of federal habeas corpus. *See Anderson v. Love*, 681 F.Supp. 1279, 1283 (M.D.Tenn. 1986).

In the present case, petitioner is unable to show how his defense was prejudiced by the defective information which charged him with placing the explosives with the intent to injure his wife, rather than the building. Petitioner was on notice that he was being charged with sending a bomb to his wife's place of employment. He was made aware of the date and time. Petitioner has offered no cogent argument as to how his defense would have been different had he been informed that the prosecutor was charging him with attempting to injure the building, rather than his wife. The Court concludes that the information in this case adequately informed petitioner of what he was being charged with and what he would need to defend against.

### G. Claim # 9. The jury claims.

In his ninth claim, petitioner alleges that he was prevented from a fair trial because of extensive pre-trial publicity in his case. As a related claim, petitioner claims that the jury panel was tainted because several prospective jurors were acquainted with either the prosecutor or some of the police officers in this case. Petitioner claims that the trial court erred in failing to *sua sponte* change venue in this case.

There are two types of prejudice which can arise in cases where jurors are exposed to pre-trial publicity. Prejudice to a defendant can be presumed in cases where the influence of the news media, either in the community at large, or in the courtroom itself, "pervaded the proceedings". *Murphy v. Florida*, 421 U.S. 794, 798–799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (internal citations omitted). However, pre-trial publicity, even pervasive adverse publicity, does not inevitably lead to an unfair trial. *De Lisle v. Rivers*, 161 F.3d 370, 382 (6th Cir.1998). The "indicia of impartiality" on the part of a jury is disregarded only in those cases "where the general atmosphere in the community or the courtroom is sufficiently inflammatory". *Id.* at 382 (quoting *Murphy v. Florida*, 421 U.S. at 802, 95 S.Ct. 2031). The mere prior knowledge of the existence of a case, or familiarity with the issues involved, or even some pre-existing opinion as to the merits of the case, does not in and of itself raise a presumption of a jury taint. *De Lisle*, 161 F.3d at 382.

A person is not automatically rendered unqualified to serve as a juror merely because he or she has been exposed to media coverage of the charged offense; the issue becomes whether the exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented. *United States v. Hall*, 152 F.3d 381, 411 (5th Cir.1998).

In the present case, petitioner has presented no evidence to the Court showing the type of extensive or inflammatory pre-trial publicity that has been condemned by the U.S. Supreme Court. This Court has reviewed the extensive news articles about the case submitted with the petition. The stories were factual in nature and did not present a bias against petitioner. Some of the stories were, in fact, favorable to petitioner. The U.S. Su-

preme Court has emphasized the negative effect of pre-trial publicity when the publicity amounts to an "out-of-court campaign to convict", reflecting "inflamed public sentiment." *De Lisle v. Rivers,* 161 F.3d at 385 (quoting *Shepherd v. Florida,* 341 U.S. 50, 52–53, 71 S.Ct. 549, 95 L.Ed. 740 (1951)). However, coverage that consists of "straight news stories rather than invidious articles which tend to arouse ill will and vindictiveness" are not so troubling. *Id.* at 385 (quoting *Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962)).

Moreover, there is nothing from the record or the habeas petition to indicate that the courthouse in petitioner's trial was "conducted in a circus atmosphere, due in large part to the intrusion of the press". *Murphy v. Florida,* 421 U.S. at 799, 95 S.Ct. 2031 (quoting *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)). Petitioner has presented no evidence to demonstrate that the general atmosphere in the community or courtroom was "sufficiently inflammatory" for either the Michigan courts or the court to disregard the jury's "indicia of impartiality". *Murphy v. Florida,* 421 U.S. at 802, 95 S.Ct. 2031. In this case, there are no allegations made by petitioner that his trial took place under the conditions of "total chaos" that prevailed in cases like *Estes* or *Sheppard.*[3] A review of those cases leaves no doubt that it was "that chaos which drove those decisions". *DeLisle v. Rivers,* 161 F.3d at 384 (citing to *Murphy v. Florida,* 421 U.S. at 799, 95 S.Ct. 2031). Because the record does not indicate that petitioner's trial took part in a "circuslike atmosphere", the court cannot presume prejudice to petitioner's case merely because the jurors were exposed to pre-trial publicity about his case.

Petitioner has also failed to show actual prejudice to his case from the jurors' exposure to the pre-trial publicity. To demonstrate actual prejudice, petitioner must show that one or more jurors entertained an opinion before trial that petitioner was guilty and that these jurors could not put this prejudice aside and render a verdict based solely upon the evidence. *Mills v. Singletary,* 63 F.3d 999, 1009 (11th Cir.1995). The test for whether pre-trial publicity necessitates a change in venue is whether a juror exposed to pre-trial publicity can lay aside his or her impression or opinion and render a verdict based upon the evidence presented in court. *Kelly v. Withrow,* 822 F.Supp. 416, 427 (W.D.Mich.1993).

In the present case, only two prospective jurors, both of whom were excused by the court, indicated that they had read or heard news stories about the case and could not be fair towards petitioner. The partiality of a petit jury is evaluated in light of the persons who are ultimately empaneled and sworn, and not by those who are excused from service. *United States v. Lacey,* 86 F.3d 956, 969 (10th Cir.1996). Because these two persons were excused, petitioner is unable to show that the jury as impaneled was prejudiced towards him because of the news coverage in this case.

In this case, there is nothing from the record to show that any pre-trial publicity tainted the jury pool where none of the jurors that served on petitioner's jury indicated that they had formed an opinion about the case from the stories that they had read or heard about either from the media or from persons in the community. The facts in this case do not even remotely approach those cases where courts have found that extensive pre-trial publicity de-

---

**3.** *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

nied a defendant a fair trial by tainting the jury. In *Irvin v. Dowd,* 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the U.S. Supreme Court found actual prejudice to a defendant being tried for rape and murder where the rural community where he was being tried had been subjected to a "barrage" of inflammatory publicity immediately prior to trial, including information on the defendant's prior convictions, his confession to twenty four burglaries and six murders, and his unaccepted offer to plead guilty to the murder charge to avoid the death penalty. In finding actual prejudice to the defendant, the U.S. Supreme Court noted that eight of the twelve jurors who actually sat on the case had formed an opinion that the defendant was guilty before the trial began, with some jurors indicating that it would take evidence to overcome that belief. *Id.*

■ By contrast, none of the jurors seated here indicated that they had formed any opinion about petitioner's guilt or innocence from the pre-trial publicity. In response to the trial court's voir dire, all of the jurors indicated that they could be fair and impartial and would be willing to find petitioner not guilty if the prosecutor failed to prove guilt beyond a reasonable doubt. A prospective juror's exposure to pre-trial publicity does not merit his or her disqualification, where the juror states unequivocally, as was the case here, that he or she would decide the case on the facts brought out at trial. *McQueen v. Scroggy,* 99 F.3d 1302, 1319 (6th Cir.1996). Petitioner has failed to establish actual prejudice on the part of these jurors in light of the fact that all of the jurors seated indicated that they had not formed an opinion about the case from their pre-trial exposure to stories about the case and would

base their judgment solely upon the evidence introduced in the trial court. *See Gilday v. Callahan,* 866 F.Supp. 611, 625 (D.Mass.1994).

■ As a related claim, petitioner alleges that the trial court should have moved the trial to another venue, because several prospective jurors indicated that they were acquainted with either the prosecutor or some of the police officers in this case. None of these jurors indicated that they had a close relationship with the prosecutor or police, and all of the jurors indicated that their relationship with these individuals would not prevent them from being fair.

■ The presumption that a jury was not impartial is applicable only in extreme instances of juror bias, such as where there is a "revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction". *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

■ In *United States v. Abuhouran,* 162 F.3d 230, 234 (3rd Cir.1998), the Third Circuit held that a jury foreperson's "incidental acquaintanceship" with the wife of a government witness did not affect her impartiality. Likewise, in this case, these jurors' incidental relationships with either the prosecutor or the police would not have affected their impartiality. Jurors with connections with law enforcement need not be excused from jury service as a matter of law. *United States v. Nururdin,* 794 F.Supp. 277, 281 (N.D.Ill.1992).[4] In the present case, the fact that some of the prospective jurors knew either the prose-

---

4. The Sixth Circuit, in fact, has refused to recognize a *per se* requirement that any juror with a family relationship with law enforce-

ment must be disqualified. *Cox v. Treadway,* 75 F.3d 230, 239 (6th Cir.1996).

cutor or some of the police officers in this case did not violate petitioner's right to an impartial jury, where the jurors indicated that these relationships would not influence their evaluation of the testimony or their impartiality. *United States v. Beasley*, 48 F.3d 262, 266–267 (7th Cir.1995); *United States v. Frank*, 901 F.2d 846, 849 (10th Cir.1990).

 Finally, petitioner claims that the trial court judge should have moved the trial to another county because of the close personal relationship that the judge had with the prosecutor. The only evidence of this close relationship is the trial court referring to the prosecutor as "Woody Brown" on a couple of occasions. This evidence is insufficient to show that the trial court and the prosecutor had a close relationship. Petitioner's ninth claim is without merit.

### H. Claim # 11. The prosecutorial misconduct claim.

Petitioner next claims that the prosecutor engaged in misconduct by mentioning petitioner's "prior bad acts" in his summation.

 When analyzing a claim of prosecutorial misconduct, a court must initially decide whether the challenged statements were improper. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.2000). In this case, the contention that the prosecutor's statements were an improper attempt to use petitioner's involvement in other bad acts as evidence in regards to the offense charged presented a question for state evidentiary rules and therefore cannot form a basis for federal habeas relief. *See High v. Kemp*, 819 F.2d 988, 996 (11th Cir.1987); *King v. Elo*, 2000 WL 791721, * 9 (E.D.Mich. May 25, 2000) (Friedman, J.).

### I. Claim # 12. The newly discovered evidence claim.

In his twelfth claim, petitioner contends that he is entitled to a new trial because of newly discovered evidence that would prove his innocence.

 A claim of actual innocence based upon newly discovered evidence is not grounds for federal habeas relief. *Hence v. Smith*, 37 F.Supp.2d 970, 980 (E.D.Mich.1999) (Gadola, J.). "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Additionally, even those federal courts that have suggested that habeas relief could be granted upon newly discovered evidence have set an extraordinary showing of petitioner's innocence before habeas relief could be granted. *Johnson v. Hofbauer*, 159 F.Supp.2d at 606 (internal citations omitted).

 Petitioner first claims that he has newly discovered evidence that other bombings with the same signature have taken place in Michigan subsequent to petitioner's conviction. Evidence which shows only that some other individual might have committed the crime, rather than that the defendant did not commit the crime, is insufficient to meet the "probability of acquittal" standard. *Jeffries v. Blodgett*, 5 F.3d 1180, 1188 (9th Cir.1993). Petitioner's other newly discovered evidence involves factual deficiencies in the F.B.I.'s crime laboratory. This claim is defeated by the fact that the testing in this case was performed by the U.S. Postal Service laboratory. In any event, the mere existence of impeaching evidence does not warrant a new trial. *Johnson*, 159 F.Supp.2d at 606.

**658**

### J. Claim #13. The exculpatory evidence claim.

Petitioner lastly contends that the prosecutor withheld evidence that would have exculpated him of this crime. Petitioner first alleges that the prosecutor withheld a report from the Postal Service laboratory which found red or reddish brown scalp hairs inside of the packages that were sent to the ANR offices. Petitioner claims that this hair is different than his hair. Petitioner also claims that the prosecutor withheld the results of tests that had been performed on some of his tools which indicated that none of these tools had any connection to any of the four bombs.

 There are three components of a true *Brady*[5] violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). A *Brady* violation is grounds for setting aside a conviction or a sentence in a habeas proceeding only if the failure to disclose the relevant material "undermines confidence in the verdict because there is a reasonable possibility that there would have been a different result had the evidence been disclosed." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998).

 Considering the totality of evidence in this case, the hair analysis evidence alone could not have raised a reasonable doubt about petitioner's guilt. Petitioner has therefore failed to show the materiality of this evidence to establish a *Brady* claim. *See United States ex. rel. Lewis v. Lane*, 656 F.Supp. 181, 189 (C.D.Ill.1987). In addition, petitioner has failed to show how the test results which failed to link his tools to the bombs would have exculpated him, particularly where Wayne Dittman testified that petitioner had access to his tools. *See Jackson v. Anderson*, 141 F.Supp.2d at 833 (state not required by *Brady* to disclose negative test results from forensic analysis, absent a showing of a reasonable probability that the outcome of the trial would have been different had the information been disclosed). In light of the abundant evidence connecting petitioner to this crime, petitioner is unable to show how the outcome of the trial would have been different had this evidence been disclosed to the defense.

### IV. Conclusion

 The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483–484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484, 120 S.Ct. 1595. A district court has the power to deny a certificate of appealability *sua sponte*. *See Allen v. Stovall*, 156 F.Supp.2d 791, 798 (E.D.Mich.2001) (O'Meara, J.).

---

**5.** *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *Allen v. Stovall,* 156 F.Supp.2d at 798.

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that petitioner will be **DENIED** leave to appeal *in forma pauperis.*